UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHRISTINA THARP                                                                              PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:20-CV-210

APEL INTERNATIONAL, LLC                                                                   DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on the motion of Defendant Apel International, LLC ("Apel") for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a). Def. Mot. Summ. J., DN 22. Plaintiff Christina Tharp ("Tharp") filed a response, and Apel replied. Pl. Resp., DN 23; Def. Reply, DN 24. This matter is now ripe for adjudication. For the reasons stated below, the motion will be granted.

I.   *Procedural Posture of Case*

On February 24, 2020 Tharp filed a complaint against Apel in Jefferson Circuit Court alleging that Apel violated the Kentucky Civil Rights Act ("KCRA") by declining to hire Tharp after she submitted a sexual harassment complaint against an Apel employee. Pl.'s Compl., DN 1-1, PageID# 7. Apel timely removed the action to federal court under our diversity jurisdiction in accordance with 28 U.S.C. § 1441. Notice of Removal, DN 1-1, PageID# 1-3. Apel now moves for summary judgment pursuant to Fed. R. Civ. P. 56(a). DN 22.

II.  *Factual Background*

The following facts appear to be uncontested:

1

From early September through mid-December of 2019, Tharp was employed by a staffing company, Adecco USA, Inc. ("Adecco"), and assigned as a temporary worker for Apel. DN 22-1, PageID# 59; DN 23, PageID# 205, 207. Apel had a "general practice" of hiring temporary workers for permanent employment positions after about ninety days if they performed well. DN 23-1, PageID# 233.[1] However, Tharp understood that, during her assignment with Apel, she was not an Apel employee, she would receive her pay from Adecco, and she was obligated to abide by the policies and procedures of the Adecco Employee Handbook. DN 22-3, PageID# 92. Tharp was also aware that she was not "entitled to any benefits or compensation from any [Apel] benefit plan, policy, or program" and that her opportunity for a permanent position with Apel was contingent upon her performance during her temporary assignment. *Id.*; DN 22-4, PageID# 98 (acknowledging during deposition that she might earn a position with Apel if she "did a good job" and that there were no "guarantees" of any such position).

On December 2, 2019, Tharp submitted a written complaint to Apel's Human Resources Manager, Stephanie Noe ("Noe"), claiming that an Apel employee, Nacho Molina ("Molina"), had been sexually harassing Tharp at work since late September of 2019. DN 22-16, PageID# 166. Later that same day, Apel Supervisor Mike Garnett reported to Noe that he had informed Molina of the complaint against him and that Molina had resigned. DN 22-18, PageID# 172. Tharp reported that she never saw Molina again after she submitted the complaint. DN 22-4, PageID# 128.

Tharp called in sick to work on December 7 and December 9. DN 22-20, PageID# 176; DN 22-21, PageID# 178. On December 16 Tharp again missed work, purportedly due to a back

---

[1] The record suggests that a temporary worker needed to complete a certain number of hours, which could be more than ninety days, before being considered for a position with Apel. DN 22-6, PageID# 140-41; DN 24-1, PageID# 381.

2

injury. DN 22-22, PageID# 180. Noe emailed Kimberly Williams at Adecco on December 17, 2019 asking that Adecco release Tharp from her assignment with Apel, stating that Tharp had "7.5 points in a 3 month period and we only allow 8 in a 12 month period"[2] and also that Tharp "called in the past two Mondays." DN 22-24, PageID# 188. According to Apel, by the time Tharp was released from her assignment she had accumulated thirteen total absences. DN 22-1, PageID# 59.[3]

   III.   *Basis of Tharp's Claim Under KCRA*

Tharp alleges that Apel's decision not to hire her at the end of her temporary assignment was violative of Kentucky Revised Statute ("KRS") § 344.280. DN 1-1, PageID# 9; DN 23, PageID# 207. Tharp does not cite the subsection of KRS § 344.280 under which she makes her claim, nor does she explicitly point to Apel's purportedly unlawful conduct in her complaint. However, based on the briefing from both parties, the Court will address Tharp's claim as an allegation that Apel's decision not to hire her was motivated by an unlawful retaliatory intent in violation of KRS § 344.280(1). In her response to the instant motion, Tharp argues that but for her sexual harassment complaint, Apel would not have declined to offer her a permanent employment position. DN 23, PageID# 207. Tharp's theory relies on the contention that her absences did not warrant Apel's decision not to hire her. *Id.*, PageID# 214-16.

Tharp arrives at this conclusion by first pointing to comments that Noe allegedly made to Tharp complimenting her job performance and otherwise indicating that Tharp would be hired by Apel. DN 23, PageID# 210. Next, Tharp asserts that temporary employees working at Apel on assignment by a third-party staffing company are bound by the same policies and disciplinary

---

[2] Here, Noe is referring to the point system used by Apel to track employee attendance.
[3] The Court notes that there is only documentation in the record for twelve absences, but, in its briefing, Apel claims that Tharp missed work thirteen times.

3

measures as permanent employees of Apel and, that under these standards, Apel did not have a basis for its decision not to hire her. DN 23, PageID# 214.

To support the assertion that temporary workers and permanent Apel employees are subject to the same treatment by Apel, Tharp notes the fact that Apel uses the same form for keeping track of employee absences, regardless of whether the employee is temporary or permanent. *Id.*, PageID# 212. She also emphasizes a statement made during the deposition of Apel's corporate designee, Diane Breeding, which allegedly indicates that temporary and "regular" Apel employees are treated equally "when it comes to discipline and policies." DN 23, PageID# 214 (citing DN 23-1, PageID# 232). Tharp additionally argues that an inspection of the performance records of several Apel employees reveals that Apel was selective in its enforcement of its attendance policy and "did not consider attendance as a major factor in its decision to fire or retain employees." *Id.*, PageID# 214.

Finally, Tharp claims that 1. termination of employment is not compulsory under Apel's attendance policy; 2. she should have received written warnings before Apel decided not to hire her; and 3. Noe could have taken other disciplinary measures against her rather than denying her employment. *Id.* As such, Tharp contends that Noe only decided not to offer Tharp a permanent position with Apel because Tharp complained about Molina's harassment. *See id.*, PageID# 214-16 (implying that Tharp's absences were treated differently from other employees because she filed a sexual harassment complaint against an Apel employee).

IV. *Retaliation Claims Under KCRA*

Under KCRA, it is unlawful "[t]o retaliate . . . in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or

hearing under this chapter." Ky. Rev. Stat. Ann. § 344.280(1) (West). Retaliation claims filed under this Kentucky law are evaluated under the same standard used to evaluate federal Title VII claims. *Land v. S. States Coop., Inc.*, 740 Fed. Appx. 845, 848 (6th Cir. 2018) (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014)); *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 801-02 (Ky. 2004).

A. *Prima Facie Case*

In the absence of direct evidence of retaliation, a plaintiff must establish a prima facie case. *Hamilton v. GE*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-05 (1973)). An employee can substantiate a prima facie case of retaliation against his employer by showing that "(1) [the employee] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (internal quotation marks omitted)). If the employee is successful, the burden then shifts to the employer to evidence a non-retaliatory reason for the action taken against the employee. *Id.* Finally, if the employer meets this burden, the employee must show that the reason offered by the employer is pretextual. *Id.*

In the present case, both parties agree that Tharp's claim relies solely on circumstantial evidence and, hence, Tharp must establish a prima facie case against Apel. DN 22-1, PageID# 70; DN 23, PageID# 222. Additionally, for the purposes of this motion, the parties accept that Tharp engaged in a protected activity by filing a complaint against Molina, that Apel knew of this complaint, and that Apel's decision not to hire Tharp as a permanent employee was an adverse employment action. DN 22-1, PageID# 71; DN 23, PageID# 222. Thus, the first three elements of

the prima facie case are not presently in dispute. *Id.* Apel's challenge in the instant motion relates to the fourth element of the prima facie case—that is, whether there is causal connection between Tharp's filing of the complaint against Molina and Apel's decision not to hire Tharp.

### B. *Causal Nexus Between Protected Activity and Adverse Employment Action*

To establish a causal nexus between an employee's protected activity and an employer's adverse employment action, the employee "must produce sufficient evidence 'from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not' engaged in protected activity." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 910 (W.D. Ky. 2015) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). In cases where there is no direct evidence of a causal connection, an inference of causation can generally be drawn if the employee shows that "(1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 804 (Ky. 2004). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Tuttle v. Baptist Health Med. Grp., Inc.*, 379 F. Supp. 3d 622, 639 (E.D. Ky. 2019) (quoting *Montell*, 757 F.3d at 504 (internal quotation marks omitted)). While there is no bright line defining "close" temporal proximity, causation has been inferred up to eight weeks between an employer learning of an employee's protected activity and an adverse employment action. *See Stein v. Atlas Indus.*, 730 Fed. Appx. 313, 319 (6th Cir. 2018) ("How close is 'very close'? Stein has not pointed to any binding case suggesting that a period longer than eight

6

weeks will suffice. And our cases indicate that the line should be drawn shy of the ten-week mark.").

Nonetheless, in many circumstances close temporal proximity alone is inadequate to establish causation.[4] Of note, if an "intervening reason" for taking action against the employee arises between the time of the employee's protected activity and the time of the employer's adverse action, temporal proximity by itself will not be sufficient for establishing a causal connection. *See, e.g., Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (upholding dismissal of the plaintiff's claim of retaliation because the plaintiff's "extended discretionary leave and . . . failure to return to work" after he made a complaint gave rise to "an intervening reason" to terminate the plaintiff's employment).

In *Lewis-Smith v. Western Kentucky University*, the court rejected the plaintiff's attempt to causally connect the termination of her employment to a complaint that she had made four months earlier. 85 F. Supp. 3d 885, 911-12 (W.D. Ky. 2015). The court declared that, "without more," the timing of the plaintiff's termination relative to her complaint did not raise an inference of causation. *Id.* at 911. Even if the temporal proximity was close enough to raise an inference, the court stated that the plaintiff's conduct after submitting her complaint gave rise to an "intervening legitimate reason" to terminate the plaintiff's employment. *Id.* at 911-12. Specifically, the court pointed to the plaintiff's performance issues after her complaint and the fact that the plaintiff made insulting comments to her supervisor the week before she was terminated. *Id.* at 911. The court

---

[4] The Sixth Circuit has, in some cases, found a causal connection on the basis of temporal proximity alone when the "'adverse employment action occurs very close in time after an employer learns of a protected activity.'" Hamilton, 556 F.3d at 435 (quoting Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008)). However, the court has "rarely found a retaliatory motive based only on temporal proximity." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). *See also Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 471-72 (6th Cir. 2012) ("[W]e have repeatedly cautioned against inferring causation based on temporal proximity alone.").

7

concluded that these actions "dispelled" any inference of causation and, hence, the plaintiff failed to establish a prima facie case of retaliation. *Id.* at 911-912.

Apel contends that, as in *Lewis-Smith*, Tharp cannot establish a prima facie case of retaliation because she cannot substantiate the causation element. DN 22-1, PageID# 71. There were fifteen days between Tharp submitting the written complaint of sexual harassment and Noe asking Adecco to terminate Tharp's assignment with Apel. DN 23, PageID# 223. Apel maintains, and Tharp concedes, that Tharp missed work on three different occasions during in these fifteen days. DN 22-1, PageID# 66; DN 22-4, PageID# 62, 65-66. According to Apel, these absences "constituted intervening legitimate reasons for Apel to take adverse action against" Tharp. *Id.*, PageID# 73. Therefore, Apel argues that Tharp's reliance on "close temporal proximity" is not sufficient to "establish a causal connection between her reporting sexual harassment and Apel's subsequent action in not hiring her." *Id.*

In response, Tharp contends that her case is distinguishable from those cited by Apel, including *Lewis-Smith*, because "Tharp did not engage in a terminable offense after her protected activity of December 2nd." DN 23, PageID# 224. This contention seems to be based on the premise that absenteeism is not a "terminable offense" at Apel until an employee accrues eight points under point-based attendance system. *See id.*, PageID# 214 ("The primary reason given for Tharp's removal from her position at Apel was Tharp having 7.5 attendance points under Apel's supposed 8 point Rule in 12 months. This rule does not require employee [sic] to be terminated at 8 points, but allows for suspension as a possibility or even a 3rd written notice.").

Apel takes the position that it is irrelevant how an excessively absent Apel employee is treated under the Apel attendance system because Tharp was not an Apel employee. DN 24, PageID# 364. Rather, Apel claims that "temporary workers are on a type of try out" for permanent

8

employment during their assignment and that "[w]hile Apel tracked absence points as an evaluation metric, temporary workers were not subject to Apel's progressive discipline for excessive absenteeism." *Id.*, PageID# 360-61, 364. Therefore, according to Apel, it was "fully within its right" to decide not to hire Tharp based on her attendance record. *Id.*, PageID# 365.

V.     *Legal Standard*

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light

most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

  *VI.* *Analysis of Case at Bar*

  The Court finds that Apel has shown that Tharp lacks the evidence to prove an essential element of her case. Tharp has failed to provide significant probative evidence that Apel's decision not to hire Tharp as a permanent employee was causally connected to the submission of her sexual harassment complaint. Hence, Tharp cannot substantiate a prima facie case of retaliation under KCRA.

  After tendering her sexual harassment complaint to Noe on December 2, Tharp missed work on three separate occasions in fifteen days. Therefore, Apel asserts that it had a legitimate intervening reason for deciding not to offer Tharp a permanent position. Further, Apel maintains that, even if the temporal proximity of Tharp's complaint and Apel's decision not to hire her was sufficiently close to raise an inference of causation, this inference is dispelled by Tharp's own conduct after submitting the complaint. Even when viewed in the light most favorable to Tharp, the evidence Tharp has provided is insufficient to overcome Apel's assertions.

  The Court is not persuaded by Tharp's attempt to distinguish her case from *Lewis-Smith v. Western Kentucky University* by claiming that she did not engage in a "terminable offense" after submitting her complaint. Tharp's effort to graft her situation as a temporary worker for Adecco onto the framework used to discipline excessively absent Apel employees does not work. First, Tharp was not an Apel employee and was not terminated by Apel. Thus, Tharp's claim that she

was entitled to be hired by Apel because she did not accumulate enough points to constitute a "terminable offense" fails on its face.

Tharp fails to overcome this defect in her argument by suggesting that Apel had some obligation to hire her at the end of her temporary assignment unless Tharp engaged in conduct that amounted to a "terminable offense." *See* DN 23, PageID# 214-16, 224-25 (indicating that Tharp's absences were "insufficient to motivate" Apel's decision not to hire her). Tharp points to certain statements made by Noe that Tharp claims caused her to believe that she would be hired. DN 23, PageID# 210. However, Tharp cites to no authority showing that such statements, if true, legally obligated Apel to hire her.

Additionally, even if Apel was generally committed to hiring the temporary workers Adecco supplied, Tharp was aware that any potential opportunity she had with Apel was contingent on the evaluation of her job performance during her temporary assignment. *See* DN 22-4, PageID# 98 (acknowledging that she might earn a position with Apel if she "did a good job" and that there were no "guarantees" of any such position). Tharp does not provide any evidence that Apel could only decline to hire her if she engaged in the type of conduct that would justify the termination of an Apel employee. Despite this lack of evidence, Tharp maintains that Apel's decision not to offer her a position is indefensible because she had not accrued the number of attendance points for termination to be an option under Apel's disciplinary policy. *See* DN 23, PageID# 214 ("The primary reason given for Tharp's removal from her position at Apel was Tharp having 7.5 attendance points under Apel's supposed 8 point Rule in 12 months. This rule does not require employee [sic] to be terminated at 8 points, but allows for suspension as a possibility or even a 3rd written notice."). For the reasons discussed below, this contention is without merit.

Tharp's entire theory is dependent on her claim that "all employees, regular Apel employees and temp-to-hire employees working at Apel are held to the same standards when it comes to discipline and policies." DN 23, PageID# 214 (citing Breeding's Dep., DN 23-1, PageID# 232). For support, Tharp relies on a specific excerpt from Breeding's deposition. *Id.* However, the excerpt cited by Tharp (below) does not, in fact, support her claim:

> Q (Tharp's Counsel): Did you hold the temporary employees to the same standards as the regular employees when it came to discipline and policies?
>
> A (Breeding): I would have to say that in good faith with this, as it relates to policies or practices regarding breaks, I would believe that they did.
>
> Q: How about attendance?
>
> . . .
>
> A: So, it's difficult to speak of what the—you know, in 2019 what attendance standard or attendance policy that temporary employees were held because there's nothing—there is no documentation other than what is here to show anything different.

DN 24-1, PageID# 379-80. The Court notes that, while Breeding stated that temporary workers and permanent employees were held to the same standard regarding *breaks*, she made no such statement about any other policies or disciplinary measures. Furthermore, several other excerpts from Breeding's deposition evidence that Apel did not hold temporary workers and permanent employees to the same standards. For example,

> Q (Tharp's Counsel): Okay. How is it that the temporary employees' attendance policy, how did temporary and regular employees differ in policy?
>
> A (Breeding): So a regular employee who is employed by the company would follow the attendance policy based on the handbook, and then a temp employee, because they're not an employee of the company, would essentially I guess follow their own handbook.

12

> . . .
>
> Q: Do you explain to the [temporary workers] what your attendance policies or other things are?
>
> A: So they're—no, because with temp-to-hire, it's a little bit different than full-time employees. Full time employees have the point system. And I am not going to allow a temp-to-hire employee to be absent that many times, you know, during their 90 days. Yes, I just won't allow it.

DN 24-1, PageID# 376, 381. *See also id.*, PageID# 375, 377-78, 382-84.

Regarding Apel's attendance point system as it applied to temporary workers, Breeding stated, "I think that they may be tracking it . . . to keep kind of like a running record of what the points would look like" and "I think it's more of a practice that was tracked versus the policy that the full-time employees followed." DN 24-1, PageID# 382, 384. Thus, to the extent that Apel tracked a temporary worker's attendance using the point system, the evidence does not suggest, as Tharp urges, that Apel considered temporary workers to be subject to the same disciplinary protocols as its own employees.

Breeding also explained how Apel considered temporary workers during their assignments to determine if they would be a good fit as an Apel employee:

> Our temp employees, you know, they're there for, you know three months, and during that three months, I mean they're under scrutiny and they're evaluated and they're learning their role and they're— you know, we're looking at them to say, you know, in that three months, is this going to be a good employee for Apel, and is this going to be someone that we want to make that investment in.
>
> And if, you know, if there's performance issues, attendance issues, things like that, you know, it's a good predictive indicator of how well someone would do or how not as well someone would do as an employee of the company. And that's one of the—I think that's one of the advantages of having a temporary laborer there, yes, just to make that evaluation.

13

DN 24-1, PageID# 390.

Tharp does not cite to any evidence in the record to contradict Breeding's description of how temporary workers are evaluated by Apel relative to permanent Apel employees. Only a selective reading of Breeding's deposition would allow for the conclusion that temporary workers and Apel employees were held to the same standards or that a temporary worker's conduct had to rise to the level required for a permanent employee to be terminated before Apel could decide not to hire that worker. Thus, Tharp's position that she was entitled to employment with Apel absent some "terminable offense" is untenable.

In sum, Apel maintains that it was within their discretion to decline to offer Tharp a position, regardless of how she would have fared under Apel's system as a permanent employee, and Tharp's three absences in the span of fifteen days in December constituted a valid reason to decide not to hire her, any "points" evaluation aside. Tharp has not met her evidentiary burden to overcome these assertions and, hence, a retaliatory motive cannot be inferred. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013) ((""an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity'") (quoting *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 472 (6th Cir. 2012)).

Apel has shown that Tharp has failed to produce evidence establishing a causal link between Tharp submitting a sexual harassment claim on December 2 and Apel deciding not to hire her as a permanent employee on December 17, after her probationary period had expired. Therefore, she cannot prove a prima facie case of retaliation under KRCA. Accordingly, Apel is entitled to summary judgment. The motion will be granted in a separate order.

14

VII.     *Request for Reasonable Attorneys' Fees and Costs*

Apel asks that this Court grant reasonable attorneys' fees and costs based on the claim that Tharp provided false testimony and that this "misconduct . . . specifically impacted Apel's ability to defend its case." DN 22, PageID# 80. However, Apel has failed to show how its defense was harmed by Tharp's alleged perjurious testimony concerning facts wholly unrelated to the those at issue in the instant motion and acts that occurred after the events of this case. As such, this request will be denied in a separate order.

October 13, 2021

Charles R. Simpson III, Senior Judge
United States District Court